**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BENJAMIN SMITH,

                              Plaintiff,

            v.                                              No. 9:09-CV-729
                                                               (TJM/DRH)

UNITED STATES OF AMERICA; DAN
PETERSON, Factory Manager, FCI Ray
Brook; SUSAN KEIFFER, Case Manager,
FCI Ray Brook; FEDERAL
CORRECTIONAL INDUSTRIES (UNICOR),
FCI Florence, Florence, Colorado; MR.
FELNER, Unit Manager, FCI Ray Brook; D.
KIRKBY, Factory Foreman, FCI Ray Brook;
MR. LUCAS, Case Manager, FCI Ray
Brook; and T.R. CRAIG, Facility
Superintendent, FCI Ray Brook,

                              Defendants.
_____

**APPEARANCES:**                          **OF COUNSEL:**

BENJAMIN SMITH
Plaintiff Pro Se
56430-066
Federal Correctional Institution
Post Office Box 1000
Cumberland, Maryland 21501

HON. RICHARD S. HARTUNIAN          CHARLES E. ROBERTS, ESQ.
United States Attorney                         Assistant United States Attorney
Attorney for Defendants
Post Office Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

                    **REPORT-RECOMMENDATION AND ORDER**[1]
_____

            [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Benjamin Smith ("Smith"), a federal prison inmate, brings this action under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971), alleging that defendants, six employees of the Ray Brook Federal Correctional Institution ("Ray Brook"), violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1).  Smith also alleges a product liability and negligence claim under the Federal Tort Claims Act ("FTCA") against the individual defendants as well as  the United States and one of its agencies.[2]  <u>Id.</u>  Presently pending is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 23.  Smith opposes the motion.  Dkt. Nos. 27, 33.  For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to Smith as the nonmoving party. <u>See</u> subsection II(B) <u>infra</u>.  The events in question occurred during Smith's incarceration at Ray Brook.  Liberally construing his complaint, Smith asserts six causes of action concerning a variety of matters.

### A. Interference With Mail

In April 2006, Smith was involved in a civil action that he filed against the City of

_____

[2] A <u>Bivens</u> action cannot be asserted directly against the United States or federal agencies.  <u>See</u> <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 484–86 (1994) (refusing to extend <u>Bivens</u> to allow suits to be brought directly against the federal government or its agencies).

2

Philadelphia.  Compl. at 2.  At that time, defendant Keiffer, Smith's case manager at Ray

Brook, opened and read Smith's legal mail without his authorization.  Id.  Keiffer also either

failed to deliver a deposition notice to Smith or failed to advise him of the scheduled

deposition, causing Smith to miss this proceeding.  Id.  On April 28, 2006, Smith lodged an

informal complaint against Keiffer with defendant Felner, a unit manager at Ray Brook.  Id.

On that same day, Keiffer filed a disciplinary report noting that Smith failed to report to a

specified area of the facility to participate in a "legal call" despite having been previously

notified of the appointment and paged by the control room.  Smith Decl. (Dkt. No. 27–1) Ex.

A, at 3.

### B. Retaliation/False Disciplinary Reports

Smith contends that Keiffer filed the April 28, 2006, disciplinary report in retaliation for

his complaint to defendant Felner.  Compl. at 2.  This report was allegedly "swept under the

rug" and essentially ignored by defendant Felner due to its "blatant retaliatory nature."  Id.

Smith filed a formal grievance against Keiffer on June 6, 2006, complaining that she

opened and withheld his mail.  Smith Decl., Ex. A, at 4.  This grievance was denied by the

warden, who noted that the legal mail was addressed to both Smith and Keiffer.  Id. at 7a.

The warden also asserted that Smith had received proper notice of the scheduled

deposition but failed to attend.  Id.

Smith claims that on August 3, 2006, defendants Keiffer and Lucas, a case manager at

Ray Brook, threatened to retaliate against him if he continued to file grievances.

Magnusson Decl. (Dkt. No. 23–6) at 24; Compl. at 3.  Smith reported these threats to the

3

Regional Office on August 16, 2006.  Smith Decl., Ex. A, at 5–7.  On August 17, 2006,

Smith's custody classification score was changed from "Medium" to "High" by Keiffer and

Lucas.[3]  Id. at 7b; Magnusson Decl. at 24.  Smith filed a grievance related to this

classification score change on October 8, 2006 which was received on October 25, 2006.

Smith Decl., Ex. A, at 7c.  On November 2, 2006, Keiffer lodged a disciplinary report against

Smith, charging him with threatening her with bodily harm and being insolent towards a staff

member.  Id. at 8; Fehlner Decl. (Dkt. No. 23–4) Ex. B.  As a result of this incident, Smith

spent three weeks in the Special Housing Unit ("SHU").  Compl. at 3.

    In late 2006 and early 2007, Smith appealed numerous grievances to the Regional

Office that had been denied by administrators at Ray Brook.  Magnusson Decl. at 14, 16,

18, 20, 22, 24.[4]  In all of these grievances, Smith complained that defendants erroneously

raised his custody classification score and filed false disciplinary reports against him in

retaliation for past grievances he lodged against Keiffer.  Id.  These appeals were

addressed and denied as the reviewers confirmed that his custody score appropriately

reflected the severity of his criminal conviction.  Id. at 15, 17, 19, 21, 23, 25.  The

administrators also found no evidence to substantiate Smith's allegations that the prison

staff had retaliated against him.  Id.

----

    [3] Smith has withdrawn his claim that his custody classification score was changed
in retaliation for the grievances filed.  See Dkt. No. 27 at 5.  Thus, his retaliation claim
involves only the allegedly fraudulent and retaliatory disciplinary reports regarding his
failure to attend the deposition and his threatening conduct on November 2, 2006.

    [4] As of April 2010, Smith had filed a total of 119 grievances through the
Administrative Remedy Program.  Magnusson Decl. at 2, ¶ 6.

### C. Biased Disciplinary Hearing Officer

As a result of the November 2, 2006, incident, a disciplinary hearing was held at which defendant Felner presided as the hearing officer.  Compl. at 3; Felner Decl. ¶ 6.  Smith maintains that Felner was biased against him based on his prior knowledge of the ongoing retaliation.  Compl. at 3.  Smith claims, and defendants deny, that during the hearing Felner stated that the assault charge would be dismissed "because he knew that Mrs. Keiffer was lying," but that he had to find Smith "guilty of something."  Id.; Felner Decl. ¶ 9.  At the conclusion of the hearing, Felner found that the charged conduct did not amount to a "High Severity" offense but did constitute the "Moderate Severity" offense of "Insolence."  Felner Decl. ¶ 7.  Felner then "informally resolved" the matter through verbal counseling and "extra duty," and recommended that Smith be released from the SHU.  Id. ¶ 8.

### D. Inadequate Conditions of Confinement

While Smith was in the SHU, he shared the small cell with three other inmates.  Compl. at 3.  This cell had one toilet that had to be flushed by a corrections officer from outside the cell.  Id.  However, the corrections officers, who are not specifically named in the complaint, refused to flush the toilet or provide the inmates with toilet paper for two weeks.  Id.  Smith and the other inmates were forced to use pieces of clothing and napkins as toilet paper.  Id.  The toilet eventually overflowed, causing human waste to pour onto the floor of the cell.  Id.  Smith, who slept on a plastic mattress on the floor near the overflowing toilet, became nauseous and lightheaded from the odor.  Id.  Smith claims that the prison staff, particularly Fehlner, knew of but ignored these conditions.  Id.

5

### E. Product Liability/Negligence

On June 12, 2007, Smith was sitting in an office chair while working in the "factory" at Ray Brook.  Id. at 4.  As Smith leaned back, the chair broke, and he fell backward onto a sheared metal support bar.  Id. at 4.  This resulted in an injury to Smith's lower back.  Id. Smith maintains that the chair, which had been manufactured by UNICOR[5] at the Florence Federal Correctional Facility in Florence, Colorado, was "defective."  Id.  Smith also asserts that defendant Peterson, factory manager at Ray Brook, and defendant Craig,[6] facility superintendent at Ray Brook, knew that this particular chair was defective but failed to take steps to protect him from this unsafe condition.  Id.[7]  Smith filed a claim with the Federal Bureau of Prisons seeking monetary damages for the injuries he received due to the allegedly defective chair.  Magnusson Decl. at 50.  This claim was rejected, and Smith was advised to seek a remedy through the Inmate Accident Compensation System instead.[8]  Id.

---

[5] UNICOR, also known as Federal Prison Industries, is a government-owned corporation that employs and trains federal prison inmates, and produces various goods including office furniture.  See generally UNICOR ONLINE, http://www.unicor.gov (last visited Jan. 21, 2011).

[6] It appears that Craig is the defendant previously identified as "John Doe."  See id.

[7]Peterson maintains that the chair in question had been at Ray Brook since before he began working there.  Peterson Decl. (Dkt. No. 23–7) ¶ 3.  Peterson also denies having knowledge of any prior incidents involving the chairs at Ray Brook that would suggest they were defective or unsafe at the time of Smith's injury.  Id.

[8] The Inmate Accident Compensation System provides "compensation to inmates or their dependents for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined."  18 U.S.C. § 4126.  This system affords the exclusive remedy for federal inmates who sustain work-related injuries while incarcerated.  United States v. Demko, 385 U.S. 149, 152 (1966).  Moreover, § 4126 provides "the exclusive remedy when a work-related injury is further aggravated by negligence or medical malpractice on the part of prison medical personnel."  Moore v. United States, No. 85-CV-1151, 1988 WL 70025,

Smith sought compensation pursuant to the Inmate Accident Compensation Act, but he was denied because his injuries were deemed "non-work-related."  Smith Decl., Ex. E, at 41.

### F. Deliberate Indifference to Medical Needs

As a result of the fall caused by the broken chair, Smith suffered a puncture wound, measuring approximately 1/4" in diameter, and bruising on his lower back.  Compl. at 4. Smith contends that despite his obvious need for medical attention evidenced by "profuse" bleeding, his complaints of pain, and his inability to walk unassisted, defendants Peterson and Kirkby, factory foreman at Ray Brook, failed to request any medical treatment for him. Id.  These defendants dismissed Smith's injury as "just a little blood," and Peterson ordered him to return to his cell at the end of the work shift.  Id.  Smith notes that two inmates had to help him walk back to his housing unit.  Id.  After returning to his cell, Smith continued to bleed from his back injury and remained in pain.  Id. at 5.  Over two and one-half hours later, medical personnel were summoned by the housing unit officer.  Id.  Smith filed several grievances complaining of inadequate medical treatment related to this incident. Magnusson Decl. at 26, 28, 30.  These grievances and the subsequent appeals were denied, and the reviewing administrators found that Smith received proper and prompt medical care.  Id. at 27, 29, 31.

### II.  Discussion

Smith alleges that Keiffer intercepted his legal mail without his authorization and further

---

at *3-4 (N.D.N.Y June 30, 1988) (Munson, J.).

violated his due process rights by failing to advise him of a pending civil deposition.  Smith also alleges that after he filed grievances against Keiffer, Keiffer and Lucas retaliated by charging him with false disciplinary infractions and providing a biased hearing officer, Fehlner, at the subsequent disciplinary hearing.  Moreover, Smith claims that Fehlner was deliberately indifferent to the unsanitary conditions of the SHU, and Peterson and Kirkby were deliberately indifferent to his serious medical needs after he was injured on the broken chair.  Finally, Smith alleges that Peterson and Craig failed to protect him from the unsafe chair, which had been defectively manufactured by the United States and UNICOR.

Defendants contend that: (1) any claims related to the interference with Smith's mail in April 2006 are barred by the statute of limitations; (2) Smith did not suffer any actual injury related to the interference with his mail; (3) Smith fails to state a claim for retaliation; (4) there is no support for Smith's conclusory allegation that the disciplinary hearing officer was biased; (5) the FTCA does not authorize suits against the United States based in strict liability; (6) defendants were not aware that the chair posed an excessive risk to Smith; (7) Smith's injury was not sufficiently serious for Eighth Amendment purposes; and (8) Smith's claim under the FTCA is barred by the Inmate Accident Compensation Act.

### A. Conversion of the Motion

Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment under Federal Rule of Civil Procedure 56.  In support of their motion, defendants have submitted declarations and exhibits.  A district court may convert a motion to dismiss into a motion for summary judgment if the nonmoving party has "sufficient notice" and an opportunity to respond to the motion for summary judgment.

Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995).  To determine if notice is sufficient, "[t]he essential inquiry is whether the [non-movant] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."  Id. (internal quotation marks omitted).  Notice is especially important when the nonmoving party "is proceeding *pro se* and may be unaware of the consequences of his failure to offer evidence bearing on triable issues."  Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983).

Here, the motion to dismiss explicitly indicated that defendants sought, in the alternative, summary judgment.  See Dkt. Nos. 23, 23–1.  Moreover, defendants provided Smith with a Notification of the Consequences of Failing to Respond to a Summary Judgment Motion.  Dkt. No. 23–9.  This form advised Smith of Local Rule 7.1's requirement that he submit the following in opposition to the motion: a memorandum of law, one or more affidavits, and a concise statement of material facts.  Id.  It also cautioned that failure to respond to the motion might result in the dismissal of some or all of his claims.  Id.  These documents provided sufficient notice that the defendants' motion to dismiss was likely to be converted into one for summary judgment.  This is further evidenced by the fact that Smith filed a lengthy memorandum of law, a declaration, and 55 pages of exhibits in opposition to the defendants' motion.  See Dkt. Nos. 27, 27–1.  Smith also filed a subsequent reply titled "Plaintiff's Response to Defendants' Reply to the Motion in Opposition to Summary Judgment."  Dkt. No. 33 (emphasis added).  Clearly, Smith had sufficient notice that the motion might be converted, and he responded accordingly.

9

**B. Summary Judgment—Legal Standard**

A motion for summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323.  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson, 477 U.S. at 248.  All ambiguities are resolved and all reasonable inferences are drawn in favor of the nonmoving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must respond by setting forth facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 250.  The nonmoving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the nonmoving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant,

10

a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant No. 1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247–48.

### C. Interference With Mail

Smith alleges that Keiffer intercepted his legal mail in April 2006 and caused him to miss a scheduled deposition.  Defendants argue that these claims are barred by the statute of limitations or, alternatively, should be dismissed on the merits.

### 1. Statute of Limitations

"It is undisputed that the statute of limitations for a Bivens action arising in New York is three years."  Thunder Island Amusements, Inc. v. Ewald, 650 F. Supp. 2d 195, 199 (N.D.N.Y. 2009) (McCurn, S.J.) (citing Tapia-Ortiz v. Doe, 171 F.3d 150, 151 (2d Cir. 1999) (per curiam)).  The record shows conflicting dates on which the complaint was filed.  The docket sheet indicates that the complaint was postmarked on June 16, 2009, and filed on June 25, 2009.  The official district court stamp on the first page of the complaint shows that it was filed on June 25, 2009.  Compl. at 1.  Smith signed the fourth page of the complaint

and dated it as June 12, 2009.  Id. at 4.  However, the handwritten attachment to the complaint has an official district court stamp with a filing date of November 5, 2008, and was signed by Smith on October 31, 2008.  Id. at 5, 9.  Smith explains that he filed his original complaint on November 5, 2008, and amended that complaint on June 25, 2009. Dkt. No. 33, at 1.

If the complaint was filed in June 2009, the interference with legal mail claim, which arises from events occurring prior to June 2006, would be barred by the statute of limitations.  On the other hand, if the complaint was filed in November 2008, this claim is timely as the events occurred after November 2005.  Liberally construing the complaint and making all reasonable inferences in Smith's favor, it must be determined that the complaint was filed on November 5, 2008.  The handwritten part of the complaint bears an official stamp indicating that it was filed on that date.  Therefore, Smith has offered sufficient facts at least to raise a material issue whether the complaint was filed within the period of limitations and defendants' motion on this ground should be denied.


### 2. Merits of the Mail Interference Claim

Smith alleges that Keiffer intercepted and withheld his legal mail, causing him to miss a scheduled deposition pertaining to an ongoing civil action.  Because the legal correspondence at issue was clearly addressed to "Benjamin Smith, Pro Se, c/o Susan Keiffer, Case Manager," Smith's claim that Keiffer was not authorized to open this mail is without merit.  The envelope, notices of deposition, and letter from the attorney who was to take Smith's deposition were all addressed in this manner.  Dkt. No. 28, Exs. A, B, C, & E.

Moreover, after Smith failed to attend the first scheduled deposition on April 28, 2006, a

letter was mailed directly to Ray Brook's warden in an attempt to reschedule the proceeding.  Id. at Ex. D.  It is clear that the court and defense counsel in the civil action sought to communicate directly with prison staff and administrators in an effort to schedule Smith's deposition.  Therefore, it was entirely proper for those staff members to open and read such correspondence.  Smith's mail interference claim is thus limited to his assertion that Keiffer's actions or omissions interfered with his ability to participate in the pending civil action.

Interference with an inmate's legal mail implicates the right to access the courts guaranteed by the Fourteenth Amendment.  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  To state a valid claim, a prisoner must allege that the official deliberately and maliciously interfered with legal mail, resulting in an "actual injury" such as a dismissal of an otherwise meritorious legal claim.  Id.; see also Lewis v. Casey, 518 U.S. 343, 351 (1996). Further, "[w]hile a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation."  Davis, 320 F.3d at 351 (internal citation omitted).  Instead, the prisoner must show that officials "regularly and unjustifiably interfered with the incoming mail."  Id. (internal quotation marks omitted).

Smith identifies only one specific instance in which Keiffer interfered with his legal mail, causing him to miss a scheduled deposition.  Not only does this act fall short of "regular" interference, but Keiffer's act was justified.  Indeed, as noted above, the mail bore her name in the address.  Moreover, defendants have countered with evidence indicating that Smith was properly advised of the pending deposition.  On the April 12, 2006, letter that accompanied the notice of deposition, there is a handwritten note indicating:  "Inmate Smith

aware of time and date per our conversation outside of unit 4-26-06 – he stated he didn't

need to be put on call out."  Dkt. No. 28, Ex. C.  Smith fails to respond with any evidence to

support his conclusory assertion that Keiffer maliciously failed to advise him of the

deposition appointment.

In addition, Smith fails to allege an actual injury.  Although missing a scheduled

deposition may cause delay and annoyance, it is not tantamount to the dismissal of a

meritorious claim.  It appears that the deposition that Smith missed on April 28, 2006, was

rescheduled for May 22, 2006.  Id. at Ex. D.  There is nothing in the record to suggest that

this rescheduled deposition did not take place or that Smith was negatively impacted by

missing the first appointment.

Therefore, Smith has not sufficiently alleged malicious intent on the part of Keiffer nor

identified any actual harm he suffered.  Accordingly, it is recommended that defendants'

motion be granted as to Smith's mail interference claim.


### D. Retaliation/False Disciplinary Reports

Smith alleges that he was subjected to retaliation on two occasions.  Smith claims that

Keiffer filed false disciplinary reports against him on April 28, 2006, and November 2, 2006,

after he filed administrative grievances against her.[9]  Claims of retaliation are rooted in the

---

[9] Smith also asserts that Lucas threatened to retaliate against him by stating "we are going to get you."  Compl. at 3.  However, this does not constitute "adverse action" to support a retaliation claim.  See Smith v. Christopher, No. 9:06-CV-1196, 2008 WL 4283519, at *13 (N.D.N.Y. Sept. 16, 2008) (Kahn, J. & Peebles, M.J.) (defendant's threat that if plaintiff did not drop his lawsuit he would "never see the streets again" was "nothing more than simple verbal harassment which does not rise to the level of constitutional significance"); Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do

First Amendment.  See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004).  To state an actionable claim for retaliation, a plaintiff must first show that the conduct at issue was constitutionally protected and, second, that the conduct was a "substantial or motivating factor for the adverse actions taken by prison officials."  Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003).  If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Courts must view retaliation claims with care and skepticism due to the ease with which they can be fabricated and to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214–15 (N.D.N.Y. 2008) (McAvoy, S.J. & Lowe, M.J.).  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)).  For purposes of the first element of the claim, it is undisputed that the filing of grievances is constitutionally protected conduct.  See Gill, 389 F.3d at 384; Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002).

---

not rise to the level of adverse action.").  There is nothing to provide a causal connection between Smith's protected conduct and Lucas.  Lucas was not named in any of the grievances that pre-date the disciplinary reports, and he did not file any disciplinary reports against Smith.  Therefore, Smith cannot establish a retaliation claim against Lucas.  See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (affirming the dismissal of a retaliation claim because defendant was not named in plaintiff's original grievance); Tafari v. McCarthy, 714 F. Supp. 2d 317, 373–74 (N.D.N.Y. 2010) (Hurd, J. & Lowe, M.J.) (plaintiff could not establish any connection between the grievances he filed and defendants who were not named in the grievances).

**1. April 28, 2006 Disciplinary Report**

Smith's contention that Keiffer filed the April 28, 2006 disciplinary report in retaliation for his complaints about her opening his legal mail is conclusory and unsupported by the record.  Smith fails to identify or provide a copy of any formal grievance he filed against Keiffer prior to April 28, 2006.  In fact, the earliest formal grievance related to the alleged mail interference is dated June 6, 2006, and was received on July 17, 2006.  Smith Decl., Ex. A, at 4.  Moreover, Smith seems to have changed his argument regarding Keiffer's motivation for this disciplinary report, claiming it was filed in an effort to "cover her back" after failing to notify him of the scheduled deposition.  See Dkt. No. 27 at 3.  Smith has therefore failed to establish a causal connection between any constitutionally protected conduct and the April 28, 2006, disciplinary report.  See Tafari, 714 F. Supp. 2d at 373 (plaintiff failed to establish a causal connection because he only filed a grievance after the report was lodged against him).

**2. November 2, 2006 Disciplinary Report**

Smith claims that the November 2, 2006, disciplinary report was filed in direct response to the formal grievance he filed on October 8, 2006.  The first prong of the analysis is therefore met.  The issue thus becomes whether the grievance was a substantial or motivating factor for the disciplinary report.

"[T]he temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."  Gayle, 313 F.3d at 683.  Here, Smith filed a grievance against Keiffer on October 8, 2006, it was received on October 25, 2006,

16

and Keiffer lodged a disciplinary report against him on November 2, 2006.  Smith Decl., Ex.

A, at 7c; Magnusson Decl. at 24.  This close temporal relationship provides circumstantial

evidence that the disciplinary report was retaliatory.

However, unlike Gayle, the disciplinary report at issue here did not arise from the same

statements or facts involved in the grievance.  See Gayle, 313 F.3d at 683 (giving additional

support to plaintiff's retaliation claim because the disciplinary report arose from statements

plaintiff made to defendant while discussing the grievance he had filed six days earlier).

Indeed, the grievance and the disciplinary report involve wholly independent facts and

circumstances.  While Smith's grievance complained that Keiffer and Lucas improperly

raised his custody classification score in August 2006, the disciplinary report charged Smith

with threatening bodily harm and being insolent towards a staff member after he allegedly

approached Keiffer in a physically threatening manner on November 2, 2006.  Smith Decl.,

Ex. A, at 7c–8.

Smith asserts that his retaliation claim is further supported by the outcome of the

disciplinary hearing that followed the November 2, 2006, incident.  Smith claims that since

he was only found guilty of a lesser offense and was released from the SHU, it follows that

the original charges were fabricated and retaliatory.  This reasoning is not persuasive and, if

followed, would undermine the prison disciplinary review process.  There is nothing to

suggest that Fehlner's decision finding Smith guilty of a lesser offense than that originally

charged by Keiffer was an attempt to cover up or remedy retaliatory action.

Therefore, the only link between Smith's grievance and the disciplinary report is the

temporal proximity and Smith's conclusory allegation that the report was retaliatory and

false.  This is insufficient to survive summary judgment.  See Colon v. Coughlin, 58 F.3d

17

865, 873 (2d Cir. 1995) (noting that where circumstantial evidence is the sum total of plaintiff's proof, "we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case").  There is thus insufficient support for Smith's claim that his exercise of constitutionally protected conduct, filing grievances, was the motivating factor behind the November 2, 2006, disciplinary report.  Accordingly, it is recommended that defendants' motion as to Smith's retaliation claim be granted.

### 3. False Disciplinary Reports Claim

An inmate "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986).  To constitute an actionable claim, "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right" or the denial of procedural protections.  Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997); Freeman, 808 F.2d at 952.  Because Smith makes no specific allegation that he was denied a required procedural safeguard and, as explained immediately above, he cannot establish a claim of retaliation, any remaining due process claim regarding the issuance of false disciplinary reports must also fail.  Defendants' motion as to any such claims should also be granted.

### E. Biased Hearing Officer

Smith next alleges that his due process rights were violated by Felner, who presided over the disciplinary hearing that followed the November 2, 2006, incident and was biased

18

against him.  It is well-established that an "inmate subject to a disciplinary hearing is entitled to an impartial hearing officer."  Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996).  Although a hearing officer's impartiality does not have to mirror that of judges generally, the result of a disciplinary hearing cannot be "arbitrarily and adversely predetermined."  Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989).  An impartial hearing officer is one who "does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen."  Patterson v. Coughlin, 905 F.2d 564, 570 (2d Cir. 1990).  Prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased.  Allen, 100 F.3d at 259.

To support his assertion that Fehlner was biased, Smith claims that Felner was aware of Keiffer's allegedly retaliatory conduct.  Compl. at 3.  However, Felner's knowledge of, or even participation in an investigation into, Keiffer's alleged retaliatory actions does not demonstrate bias against Smith.  See Vega v. Artus, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009) (Suddaby, J.) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Smith also points to a statement Felner allegedly made at the hearing in which he admitted that the disciplinary report was false but had to find Smith "guilty of something."  See Compl. at 3; Smith Decl., ¶ 13.  Assuming this to be true, as must be done for purposes of this motion, it indicates that Felner's decision was arbitrarily and adversely predetermined.  Even though only of a lesser charge, Smith was indeed found guilty.  Fehlner vehemently denies ever making such a statement.  Felner Decl. ¶ 9.  Nonetheless, this dispute raises a triable issue of fact.  See Keesh v. Goord, No. 04-CV-271A, 2007 WL

2903682, at *15 (W.D.N.Y. Oct. 1, 2007) (denying defendants' motion for summary judgment in light of prisoner's sworn assertion that the hearing officer advised that his guilt had been predetermined, even though the hearing officer vigorously disputed making such a statement).  Accordingly, it is recommended that defendants' motion for summary judgment be denied as to Smith's due process claim that the hearing officer was biased.

### F. Eighth Amendment

Smith alleges two Eighth Amendment violations:  (1) the unsanitary conditions of his confinement in the SHU and (2) the inadequate medical treatment he received after he was injured on the broken chair.

### 1. Conditions of Confinement

The Eighth Amendment prohibition against cruel and unusual punishment extends to prison conditions.  Horne v. Coughlin, 155 F.3d 26, 31 (2d Cir. 1998).  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

In order to satisfy the objective element of this claim, "a 'plaintiff must demonstrate that the conditions of his confinement result[ed] in . . . serious deprivations of basic human

20

needs' or deprived him 'of the minimal civilized measure of life's necessities.'" Govan v.

Campbell, 289 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) (Sharpe, M.J.) (quoting Anderson v.

Coughlin, 757 F.2d 33, 34–35 (2d Cir. 1985)).  Basic human needs include "food, clothing,

shelter, medical care, and reasonable safety."  Phelps v. Kapnolas, 308 F.3d 180, 185 (2d

Cir. 2002) (citation and internal quotation marks omitted).

The subjective prong requires "a prison official [to] have a sufficiently culpable state of

mind . . . of deliberate indifference to inmate health or safety."  Farmer, 511 U.S. at 834

(citations omitted).  This entails a showing that the prison official knew of but disregarded an

excessive risk to inmate health or safety.  Id. at 837.  Such knowledge can be inferred from

circumstantial evidence "and a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious."  Id. at 842.

Here, Smith asserts that he was housed in a cell of the SHU with three other inmates

and was not provided toilet paper for two weeks.  Compl. at 3.  Smith further alleges that

the prison officers refused to flush the toilet, which was controlled from outside of the cell,

causing the toilet to overflow and covering the floor with urine and feces.  Id.  Smith claims

that he was forced to sleep on the floor near the sewage and became ill due to the odor.  Id.

Such conditions satisfy the objective element of an Eighth Amendment claim.  See Gaston

v. Coughlin, 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law

the principle that it is not cruel and unusual punishment for prison officials knowingly to

allow an area to remain filled with sewage and excrement for days on end."); Reeder v.

Hogan, No. 9:09-CV-520, 2010 WL 3909050, at *7 (N.D.N.Y. Sept. 30, 2010) (Mordue,

C.J.) ("Deprivation of toiletries, 'especially toilet paper, can rise to the level of

unconstitutional conditions of confinement.'" (quoting Trammell v. Keane, 338 F.3d 155,

21

165 (2d Cir. 2003)).

With regard to the subjective element, Smith fails to name the prison guards who allegedly refused to flush the toilet and does not attempt to ascribe this conduct to Fehlner. However, he asserts that "Mr. Fehlner, Unit Manager knew of the fact that raw sewage could make plaintiff sick but [he] ignored his complaints which caused his sickness and nausousness [sic]." Compl. at 4. This language, liberally construed, suffices to allege that Felner was aware of the inhumane conditions in the SHU but failed to take remedial action despite Smith's complaints that the odor of sewage was making him ill. See Gaston, 249 F.3d at 166 (assertion that defendant prison guards "made daily rounds of SHU" was sufficient to establish that they had actual knowledge of obvious inhumane conditions). This satisfies the subjective element of the Eighth Amendment claim.

Importantly, nowhere in their motion papers do defendants dispute that Felner knew of the conditions in the SHU. In fact, they do not address the conditions-of-confinement claim at all in the initial motion. See generally Dkt. No. 23. Defendants' attention to this claim is limited to a single paragraph in their Reply to Plaintiff's Response in which they simply assert that the claim must be dismissed because Smith failed to name the prison guards who refused to flush the toilet. Dkt. No. 28 at 5. Moreover, in his own declaration, Felner does not mention the conditions-of-confinement claim at all. See Felner Decl. Accordingly, it is recommended that defendants' motion for summary judgment be denied as to Smith's conditions-of-confinement claim against Felner.

22

### 2. Medical Care

To state an Eighth Amendment claim for inadequate medical care, a plaintiff must establish the same objective and subjective elements as outlined in the conditions-of-confinement claim above.  See Helling v. McKinney, 509 U.S. 25, 35 (1993).  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer, 511 U.S. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).  When determining if a medical condition is sufficiently serious, a court may consider factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged in the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.  Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).

In this case, Smith fails to establish a serious medical need to satisfy the objective

23

element.  Smith claims that he suffered a puncture wound measuring 1/4" in diameter as well as a bruise measuring 10" long and 3" wide on his lower back when he fell onto the broken chair.  Compl. at 4.  Smith maintains that he bled "profusely" and required the assistance of two inmates to walk back to his cell.  Id.  However, the medical records do not support his assertion that his injuries were serious.

The Inmate Injury Assessment and Followup form, completed by an emergency medical technician on the day of Smith's injury, indicates that Smith suffered a "small scrape" on his upper buttock.  Magnusson Decl., Ex. E.  The injury required "Minor First Aid," and Smith was advised to rest, ice his back, and make a sick call if the pain worsened. Id.  Moreover, on the Inmate Injury Report, which Smith signed, the incident is summarized by the following: "Leaned back in chair and chair back rest snapped off.  Injured fell back onto piece of metal which snapped causing a small cut/puncture."  Smith Decl., Ex. E, at 36 (emphasis added).  A small cut requiring minor first aid is insufficient to establish the objective element of Smith's Eighth Amendment claim.  See Dawes v. Coughlin, 159 F.3d 1346 (2d Cir. 1998) (a 1½-inch laceration on inmate's elbow is insufficient to constitute a serious injury under the Eighth Amendment); Tafari, 714 F. Supp. 2d at 354 (bruises and superficial lacerations from an assault did not constitute a serious medical condition).

Accordingly, it is recommended that defendants' motion as to Smith's Eighth Amendment claim of inadequate medical care be granted.

### G. Product Liability/Negligence

Smith invokes the FTCA and seeks compensation from the United States and UNICOR for injuries he received due to the allegedly defective chair.  Smith also alleges that

defendants Peterson and Craig were negligent in their failure to inspect the chair to ensure it was safe for use.[10]  Defendants argue that the Inmate Accident Compensation Act ("IACA") is the exclusive means of recovery for Smith's work-related injuries, and, therefore, the court lacks jurisdiction to adjudicate his FTCA claim.

## 1. Inmate Accident Compensation Act

The IACA allows for the compensation of federal prison inmates "for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined."  18 U.S.C. § 4126(c)(4).  Defendants are correct that the IACA is the exclusive remedy for a prisoner's work-related injuries.  28 C.F.R. § 301.319; United States v. Demko, 385 U.S. 149, 152–54 (1966).  Smith sought recovery through the IACA process and was apparently denied because his injuries were not work-related.  Although Smith was in the factory at Ray Brook when the incident occurred, the Injury Report indicates that his injuries were "Non Work Related" because the incident "did not occur at his work station."  Smith Decl., Ex. E, at 36.  After the prison Safety Committee denied his initial claim, Smith filed a grievance with the warden's office at

_____

[10] It is also possible to interpret Smith's claim against these defendants as a conditions-of-confinement claim under the Eighth Amendment.  However, such a claim would fail as Smith cannot establish that Craig or Peterson acted with the requisite culpable state of mind.  There is nothing to suggest that they were aware of and consciously disregarded the allegedly unsafe condition of the chair prior to Smith's fall.  Indeed, Peterson denied having knowledge of any prior incidents involving the chairs at Ray Brook.  Peterson Decl. at ¶ 3.  As explained below, Smith cannot establish that these defendants were negligent.  Therefore, neither can they be found to have acted with deliberate indifference, which requires proof of a state of mind beyond that for mere negligence and akin to recklessness.  See Farmer, 511 U.S. at 839–40.  Moreover, it appears that Smith has abandoned any Eighth Amendment claims against Peterson.  See Dkt. No. 27 at 8.

FCI Cumberland, where he had been transferred.  Id. at 38.  The warden denied the claim, arguing that Smith's injuries were caused by his own negligent use of the chair and noting that the supervisory staff had determined the incident was not work-related.  Id. at 39.  Smith appealed this decision to the Administrator of National Inmate Appeals, who also denied the IACA claim because his injuries were "non-work-related."  Id. at 41.

Thus, defendants have consistently asserted that Smith's injury was not work-related and, therefore, that the IACA was inapplicable.  On this motion, defendants assert that Smith's claim under the FTCA is barred by the IACA because his injury was work-related.  The defendants attempt to have it both ways — Smith's injury was work-related for purposes of the FTCA but not so for purposes of the IACA.  Because prison administration officials at multiple levels have already denied Smith's IACA claim and deemed his injuries non-work-related, there exists at least a question of fact as to whether Smith's injury was work-related as to bar Smith's FTCA claim.  Accordingly, defendants' motion on this ground should be denied.

## 2. Federal Tort Claims Act

The FTCA waives sovereign immunity and permits lawsuits against the United States for injuries caused by the negligence of any government employee acting within the scope of his or her employment.  28 U.S.C. § 1346(b)(1).  Defendants correctly point out that the FTCA does not allow suits against the United States based on strict product liability.  See Laird v. Nelms, 406 U.S. 797, 798–99 (1972) ("[T]he Federal Tort Claims Act itself precludes the imposition of liability if there has been no negligence or other form of misfeasance or nonfeasance on the part of the Government." (internal quotation marks and

citation omitted)).  Smith concedes this point and appears to have limited his FTCA claim to hold the United States liable for the alleged negligence of Peterson and Craig.  See Compl. at 4; Dkt. No. 27 at 8.  Smith alleges that these defendants "failed to properly inspect" the chair to ensure "safe operation and equipment."  Dkt. No. 27 at 8.  Even though defendants have not specifically responded to a negligence claim, such an action can be disposed of on the merits as Smith fails to establish a prima facie case.

Under the FTCA, a court is to apply state tort law.  Gardner v. United States, 896 F. Supp. 89, 92 (N.D.N.Y. 1995) (Scullin, J.).  To state a claim of negligence in New York, a plaintiff must establish the following elements:  (1) the existence of a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) damage proximately resulting from that breach.  Stagl v. Delta Airlines, Inc., 52 F.3d 463, 467 (2d Cir. 1995).  With regard to the duty element, "plaintiff must establish that a dangerous condition existed . . . and that the United States either affirmatively created that condition or had notice, actual or constructive, of its existence."  Gardner, 896 F. Supp. at 92.  Constructive notice can be established by showing that the defect was "visible and apparent" and existed "for a sufficient length of time prior to the accident to permit the owner to discover and remedy it." DiNunzio v. Ken-Jil Elec. Contractors, Inc., 473 F. Supp. 2d 485, 487 (S.D.N.Y. 2007) (internal quotation marks and alterations omitted).  Constructive notice is also generally found where a "reasonable inspection" would have uncovered the dangerous condition.  Id.

Here, even assuming the chair was in a "dangerous condition," Smith fails to allege or explain how defendants had actual or constructive notice of such a condition.  Peterson claimed that there had been no prior incidents involving similar chairs in the factory at Ray Brook.  Peterson Decl. ¶ 3.  There are no records of prior complaints or injuries related to

27

the chairs to establish actual notice that they were unsafe.  Moreover, Smith makes no allegations that the dangerous condition was apparent or existed long enough to establish constructive notice.  Similarly, there is no evidence that a reasonable inspection would have uncovered the dangerous condition.  Therefore, Smith cannot establish that the defendants had notice of the dangerous condition.

Accordingly, it is recommended that defendants' motion as to Smith's product liability/negligence claim under the FTCA be granted.

## III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 23) be:

    1. **GRANTED** as to his claims for:

        A. Interference with mail;

        B. Retaliation/false disciplinary reports;

        C. Eighth Amendment claim of inadequate medical care; and

        D. Product liability/negligence under the FTCA;

    2. **DENIED** as to his claims for:

        A. A biased hearing officer; and

        B. Conditions of confinement; and

    3. All defendants be **TERMINATED** except Felner.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

28

(14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)–(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  February 3, 2011
          Albany, New York

_____
David R. Homer
U.S. Magistrate Judge